## GOVERNMENT SERVICE AUTOMATION, INC., Plaintiff,

v.

## FAULKNER COUNTY, et al., Defendants.

### Nos. LR–C–93–809, LR–C–93–810.

United States District Court, E.D. Arkansas, Western Division.

Feb. 21, 1995.

---

Robert R. Ross, Little Rock, AR, for plaintiff.

Harry G. Foster, II, Helen R. Grinder, Conway, AR, Michael R. Rainwater, Little Rock, AR and Marcus Lane Vaden, Conway, AR, for defendants.

## ORDER

ROY, District Judge.

This dispute centers around contracts for computer hardware, software, and support services entered into between the plaintiff, Government Service Automation, Inc. ("GSA") and defendant Faulkner County ("the County"). The other defendants are county officials being sued both in their official and individual capacities. It is fair to say that each side considers the other to have breached its obligations under the contracts.

### I.

A threshold issue that has been put before the Court, in the form of a motion for partial summary judgment, is the County's assertion that the contracts it entered into with GSA are unconstitutional and therefore void. Specifically, the County argues that one or more of the agreements violated Article XII, Section 4 of the Arkansas state constitution, the pertinent portion of which, as amended by Amendment No. 10, is set out herewith:

The fiscal affairs of counties, cities and incorporated towns shall be conducted on a sound financial basis, and no county court or levying board or agent of any county shall make or authorize any contract or make any allowance for any purpose whatsoever in excess of the revenue from all sources for the fiscal year in which said contract or allowance is made; nor shall any county judge, county clerk or other county officer, sign or issue any scrip, warrant or make any allowance in excess of the revenue from all sources for the current fiscal year; . . . .

Ark. Const. art. XII, § 4, *as amended by* Ark. Const. amend. X.

Many facts pertinent to this question are not in dispute and are as follows:

After determining that certain aspects of its computer system were lacking, Faulkner County entered into discussions with GSA concerning the possible upgrade of said system. This culminated in three agreements being worked out: a Professional Services Agreement ("PSA"), wherein GSA would provide "data processing services to the [County]," including training; an Equipment Sales Agreement; and a "Nonexclusive License Agreement" relating to the County's use of software owned by GSA.

The agreements were signed December 16, 1992, and became effective on February 2, 1993. The PSA was to run through and including February 1, 1998. The License Agreement relating to the use of GSA's software carried no expiration date, but was to run with the PSA or until terminated by the parties as per the license agreement's terms. The Equipment Sales Agreement provided for equipment sale only, and was apparently fully performed by both sides more or less immediately after its execution. The County does not argue that the Equipment Sales Agreement is unconstitutional.

Under the PSA, the County was to pay to GSA the sum of $7,776.34 the first of every month, or a total of $93,316.08 for each 12 month period. This represented a considerable savings over the data processing ex-

penses incurred by the County in each of the previous two years.[1] The PSA contained a provision[2] which annually allowed the County to opt out of the contract if it could not afford to renew the agreement, or for any purpose except to simply exchange GSA for another computer company.

The purchase and installation of the computer equipment pursuant to the Equipment Sales Agreement apparently was effected without significant controversy. However, conflicts soon arose between GSA and the County relating to the quality of service GSA was providing under the service agreement. By the end of September, 1993, the County had formally informed GSA that unless certain complaints were resolved by November 1, 1993, the County would terminate the contract.

Without waiting that long, the County got an *ex parte* order in chancery court on October 26, 1993, which enjoined GSA from impairing the County's ability to operate the computer system and also forbade all GSA personnel from the Courthouse grounds. Two days later, GSA informed the County that it must not use GSA's proprietary software after October 31, 1993. On October 29, other warnings were sent to the County, including one that unauthorized use of the system would automatically cause the county's entire system to crash. On November 1, the County moved for an amended temporary restraining order from the chancery judge. On November 12, 1993, GSA removed the state court matter to federal court, contemporaneously filing a federal action of its own. All proceedings were consolidated by this Court's Order of November 29, 1993. After GSA amended its complaint, the defendants counter-claimed. In addition to defendants' assertion that the contracts are unconstitutional, each side essentially argues that the other has breached the contract.

## II.

The Court first considers whether the agreements in question violate Article XII, Section 4 of the Arkansas Constitution and

---

1. In 1991, the County spent $131,547; for 1992, $186,390.

2. This so called "Funding Out Provision" is discussed more fully in Part II of this Order.

are therefore void and unenforceable as a matter of law. The County's first argument along this vein is that multi-year contracts entered into by counties are *per se* unconstitutional. "The Arkansas Supreme Court has consistently held that the plain language of Amendment No. 10 bars the prohibited multi-year contracts no matter the circumstance." *Defendant's Brief in Support of Defendant's Motion for Partial Summary Judgment,* at 4.

However, the Supreme Court has never gone quite that far in any of its holdings. In fact, a few "special purpose" multi-year contracts specifically have been found to pass constitutional muster.

> This contract is valid, for it is well settled that Amendment 10 does not prohibit the creation of a debt exceeding current annual revenues if the debt is secured by and payable solely out of the income or assets of a special and separable activity such as a municipal waterworks.

*Hink v. Board of Directors of Beaver Water District,* 235 Ark. 107, 357 S.W.2d 271, 273 (1962) (city would pledge its annual net waterworks revenues to secure the performance of its contract with water district). In that same decision, a related contract was found to be unconstitutional, not because it was for a term of 50 years, but rather because it "does not contain any restriction upon the source from which the city's obligations must be paid." *Id.,* 357 S.W.2d at 273. Multi-year contracts entered into by counties or cities are not *per se* unconstitutional.

■ The County argues that in any event, this particular pair of agreements violates Article 12, § 4 of the Constitution. What is prohibited by that section are contracts in an amount which "exce[eds] . . . the revenue . . . for the fiscal year in which said contract . . . is made; . . . ." Art. 12, § 4. In cases requiring the interpretation of that part of the Constitution, the Supreme Court has consistently held that contracts made in one year which must be paid for with the revenues of a subsequent year are prohibited. "'To make a contract in one year to be paid out of the revenue of a succeeding year is a violation of [the Constitution].'" *Goodwin v. State,* 235 Ark. 457, 360 S.W.2d 490, 494

(1962), citing *Little Rock v. White Company,* 193 Ark. 837, 103 S.W.2d 58 (1937).

■ In the case at bar, it is the County which bears the burden of showing that the contracts in question are unconstitutional. "[T]he burden was on the appellant to show that performance of the agreement would require an expenditure of revenues by the City in excess of those for the year in which the contract was made." *Dailey v. City of Little Rock,* 227 Ark. 537, 299 S.W.2d 825, 826 (1957).

■ The Court finds that the County has not met this burden. The County has not provided the Court with any evidence of what total Faulkner County revenues were in either 1992, the year in which the contracts were negotiated and signed, or 1993, the year the agreements were to take effect. Thus, there is no way for the Court to determine whether the amount the County was obligated to pay under the contracts exceeded county revenues in either year. The County has accordingly failed to prove, at least at this stage of the case, that the PSA and the licensing agreement violate the Constitution.

■ Because the Court anticipates it may be asked to revisit this issue once additional evidence is put in the record, the Court now will address the issue of what figure should be taken to represent the County's contractual obligation when making the "revenue vs. obligation" comparison. The County would certainly argue that its obligation under the contract should be regarded to be $466,-580.40, which represents $93,316.08 per year for the five years of the contract. GSA, on the other hand, has already argued that merely the annual obligation of $93,316.08 should be compared to the year's total revenue since this lower figure was all that the County was obligated to pay in any one year *and* the County had an annual right to opt out of the agreement pursuant to the so called "Funding Out Provision."

Though the Arkansas Supreme Court does not seem to have squarely addressed this precise issue, an opinion by the Arkansas Court of Appeals appears instructive. In *Searcy County v. Horton,* 270 Ark. 22, 603 S.W.2d 437 (1980), that Court considered the

constitutionality of a 12 year lease for office space between lessor Horton and lessee Searcy County. Entered into in 1975, the agreement required the County to pay $180 per month during the life of the lease. In April, 1979, the County decided it did not need the space any more and refused Mr. Horton's demand for payment, despite the fact the Searcy County quorum court had already "appropriated sufficient funds to pay the rent on the office for all of 1979."

In determining that the contract was constitutional, the Court of Appeals seemed to focus on the County's obligation in a particular fiscal year *vis-a-vis* its revenues for that year.

> The burden was upon [the county] to prove that the contract incurred an obligation on the part of the county in excess of the revenues for *a* fiscal year, and no such proof appears in the record. Under the lease the county became obligated to pay rental only currently as the office space is available for use, there is no showing such obligation would exceed revenues *for any fiscal year*, and the quorum court in 1979 appropriated sufficient funds to pay the rent on the office for all of 1979.

*Id.,* 603 S.W.2d at 438 (emphasis added). Conspicuously absent is any reference to revenues for 1975, the year the agreement was entered into. The opinion concludes: "It is true the county cannot pay if the payment would be in excess of the revenue *for the year.* The record does not show this to be the case." *Id.,* 603 S.W.2d at 439 (emphasis added).

It is not clear to this Court whether the Court of Appeals was holding that Searcy County was bound for the remaining 8 years of the lease, as opposed to merely the remainder of the year for which payment had already been approved. However, it is apparent that the Court never suggested that either first year revenues or subsequent annual revenues had to exceed the full lifetime amount of the contract, $25,920.

Also helpful is Justice Ward's concurring opinion (joined by two other justices) in *Little Rock Road Machinery Co. v. Jackson County,* 233 Ark. 53, 342 S.W.2d 407 (1961), a case having to do with a lease agreement which spanned more than one year. In that case, the Supreme Court held that if a contract with a county is "void because of [the constitutional] restriction against exceeding current revenues," *Id.,* 342 S.W.2d at 408, "there can be no recovery either on the contract or on the basis of quantum meruit." *Id.,* 342 S.W.2d at 409. However, the Court took pains to point out that the machinery company had conceded on appeal that the contract was void.

> In view of this concession we are not called upon to decide the validity or invalidity of the "contract" itself but are deciding the case in accordance with appellant's concession. Certainly, this concession in the case at bar should not be construed to mean that counties are prohibited from entering into valid lease contracts.

*Id.,* 342 S.W.2d at 408.

The contract in question had an initial lease period of three months which could be renewed at the County's option for additional three month periods. In his concurring opinion, Justice Ward felt "impelled"

> to point out that Jackson County is not obligated under the ... contract to make any payments, except rentals for the first three months. This the County had a perfect right to do provided only that the rentals did not exceed the revenues for that year. Therefore, *in any given year* the County had a legal right (as long as the rentals did not exceed the revenues *of that year*) to renew the lease for a period or periods of three months if it desired to do so, *but it was not obligated to do so.* I submit that there is nothing in that kind of an arrangement which is forbidden by Amendment No. 10.

\* \* \* \* \* \*

The purpose and effect of Amendment No. 10 was explained in ... *Lake v. Tatum,* 175 Ark. 90, 1 S.W.2d 554, 556, [ (1928) ] where it was stated that it was the intention of Amendment No. 10 "... to make the revenue of *each year* pay the indebtedness incurred during that year, and that the revenue of a subsequent year should

not be applied to pay the liability of a past fiscal year, ..."

*Id.*, 342 S.W.2d at 409 (emphasis added).

In the case at bar, despite the fact that the PSA covers a five year period from February, 1993, until February, 1998, it is the Court's finding that Faulkner County is only obligated under the agreement for a year at a time because of its right to "opt out" of the agreement under the Funding Out Provision. That portion of the contract provides:

> The continuation of this agreement until 02/02/98 shall be subject to the approval of the annual cost of this agreement by the County's Quorum Court as an approved item of the County's Annual Budget. Should this agreement fail to be approved as an item in the annual County budget, the County will notify GSA in writing and the operation of this agreement shall fully terminate within sixty (60) days of the date of such notice is received or at an earlier date if so agreed by the parties of this agreement. Provided however, that the County shall not during the stated term of this Agreement enter into any agreement or arrangement under the terms of which funds subject to the County's control would be expended to provide the County services provided under this agreement without paying to GSA all funds due under the terms of this agreement for its full stated term.

Professional Services Agreement, ¶ 4.

Thus, each year the County, subject to the notice requirements of the contract, is free to terminate the agreement with GSA for any reason except to simply replace a satisfactorily performing GSA with another computer company. Because the County is only "on the hook" for one year at a time, the Court finds that the proper dollar figure to use when making the "obligation vs. revenue" comparison is the annual fee under the contract, $93,316.08. In other words, if that amount could have been paid for with the revenues received during the first year of the contract, the agreement does not run afoul of Article 12, Section 4 of the Arkansas Constitution.

Accordingly, the County's motion for partial summary judgment on constitutional grounds is denied at this time. Furthermore, the Court determines that too many factual issues remain unresolved to address any of the other grounds for entering summary judgment suggested by the County. That portion of the motion is denied at this time as well.

As the case progresses, should either side believe that summary judgment should be reconsidered by the Court, the parties will be permitted to incorporate by reference any briefs already offered and will be permitted to supplement same to cover any additional information, or new arguments, that should be brought to the Court's attention.

The Court recalls that previously the parties have informed the Court that a resolution of the constitutional issues could facilitate a negotiated settlement of this matter. The Court trusts the parties will now pursue that end.

IT IS SO ORDERED.